# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHEN D. SHAMONSKY, | |
| Plaintiff | |
| | Civil Action No. 10-766 |
| v. | |
| | Chief Judge Gary L. Lancaster |
| COMMISSIONER OF SOCIAL SECURITY, | Electronic Filing |
| Defendant | |

## MEMORANDUM OPINION & ORDER

July 25, 2011

## I. INTRODUCTION

Stephen D. Shamonsky ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 - 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 8, 10). The record has been developed at the administrative level. For the following reasons, the decision of the ALJ will be AFFIRMED.

## II. PROCEDURAL HISTORY

Plaintiff filed for SSI with the Social Security Administration on March 19, 2007, claiming an inability to work due to disability as of June 1, 2006. (R. at 94)[1]. Plaintiff was initially denied benefits on May 11, 2007. (R. at 80 – 83). A hearing was scheduled for November 13, 2008, and Plaintiff appeared to testify represented by counsel. (R. at 38). A vocational expert also testified. (R. at 38). The Administrative Law Judge ("ALJ") issued her decision denying benefits to Plaintiff on January 14, 2009. (R. at 9 – 18). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on May 19, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed his Complaint in this court on June 14, 2010. (ECF No. 3). Defendant filed his Answer on October 12, 2010. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 8, 10).

## III. STATEMENT OF THE CASE

*A. General Background*

Plaintiff was born on October 16, 1959, and was forty nine years of age at the time of the administrative hearing. (R. at 94). Plaintiff was married twice, and had three sons and one daughter. (R. at 59, 143). Plaintiff completed the ninth grade, but had no further education. (R. at 46 – 47). His work experience included a position as a laborer at a baking company from 1978 – 1990, a position as a cleaner from 2000 – 2002, a position as a laborer for a distribution company from 2003 – 2004, and a position as a packager at a gift company from 2005 – 2006.

---

[1] Citations to Doc. Nos. 6 – 6-7, the Record, *hereinafter*, "R. at __."

2

(R. at 45 – 46, 69 – 70). Plaintiff has not held any gainful employment since 2006, and has subsisted on public assistance. (R. at 47). Plaintiff did not have any physical restrictions. (R. at 47).

*B. Treatment History*

Plaintiff's psychiatric treatment history begins with his transfer to Mayview State Hospital ("Mayview"), in Pittsburgh, Pennsylvania, from the Allegheny County Jail on June 28, 2005. (R. at 142). Plaintiff was transferred for a 90-day commitment for treatment following charges of rape of an unconscious person and endangering the welfare of a child. (R. at 142). Plaintiff was under the care and supervision of facility psychiatrist, Laszlo Petras, M.D. (R. at 142).

Dr. Petras indicated in a summary of Plaintiff's treatment at Mayview that Plaintiff was of average intelligence. (R. at 142 – 43). Plaintiff was also noted to have difficulty with empathy or accepting the implications of the charges against him. (R. at 142). Plaintiff provided contradictory accounts of the circumstances leading to the charges against him, at times admitting and at times denying the charges. (R. at 142). Plaintiff also claimed to suffer from auditory hallucinations telling him to harm his self and others. (R. at 142). He initially denied problems with drug and alcohol abuse, but later admitted otherwise. (R. at 142). Plaintiff generally appeared to be sad, dejected, and depressed. (R. at 142).

Dr. Petras found that Plaintiff experienced marked improvement with a minimal amount of treatment. (R. at 142 – 43). In a short span of time, Plaintiff quickly regained an appropriate, euthymic mood. (R. at 143). He interacted well with others, and slept at night, despite his claims to the contrary. (R. at 143). Plaintiff frequently provided contradictory statements about his past and his mental state throughout the course of treatment. (R. at 143 – 44). While

3

Plaintiff attended group therapy and socialized well, he sometimes became angry and offensive towards staff. (R. at 144).

As of September 1, 2005, Plaintiff was found to be alert and oriented, without thought disorder, and with anxious and dysphoric mood. (R. at 144). His affect was appropriate, but subject to lability. (R. at 144). He used maladaptive defense mechanisms such as projecting his feelings towards others, blaming others, and rationalizing his behavior. (R. at 144). He feigned physical ailments when confronted by authority figures. (R. at 144). He demonstrated no vegetative signs of depression, and was unlikely to have experienced true auditory hallucinations. (R. at 144). He was alert and had intact memory, despite complaints to the contrary. (R. at 144).

Plaintiff was diagnosed with adjustment disorder, cocaine and alcohol dependency, and mixed personality disorder. (R. at 145). Malingering could not be ruled out with Plaintiff's conditions, and Dr. Petras considered him to be a pathological liar. (R. at 145). He was given a global assessment of functioning[2] ("GAF") score of 50, and was noted to have a poor prognosis because of his maladaptive personality traits, difficulties with substance abuse, and noncompliance with treatment. (R. at 145). He was considered competent to stand trial.[3] (R. at 145). Upon release from Mayview on September 12, 2005, Plaintiff's prognosis, diagnosis, and recommendations remained unchanged from the notes of September 1, 2005. (R. at 141).

Plaintiff was briefly admitted for inpatient treatment at Pyramid Healthcare ("Pyramid") from December 21, 2006 until January 17, 2007. (R. at 164). He initially presented for help

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

[3] Plaintiff was later found not guilty of the charged offenses. (R. at 213 – 14).

4

with his cocaine addiction. (R. at 164). His treatment included weekly group and individual therapy, reading and completing recovery materials, lectures, psychosocial evaluation, and self-assessment. (R. at 164). Plaintiff began to acknowledge his symptoms of addiction and developed effective coping mechanisms. (R. at 164). His affect was normal and appropriate, but his ability to focus and concentrate was minimal. (R. at 164). A plan was developed for outpatient treatment. (R. at 164 – 65). At discharge, Plaintiff was diagnosed with bipolar disorder and cocaine dependence, and was given a GAF score of 45. (R. at 164 – 65).

Plaintiff also was treated at Mon Yough MH/MR ("Mon Yough") beginning in June of 2006 and continuing through his administrative hearing date. (R. at 184). Plaintiff was seen by Dennis Wayne, M.D. for the duration of his treatment. The notes on record indicated that Plaintiff saw Dr. Wayne for medication management approximately fourteen times. (R. at 185 – 212). The notes showed that mental status examinations typically found Plaintiff's appearance, orientation, affect/ mood, impulse control, speech, judgment/ insight, thought processes, thought content, and suicidal ideation to be within normal limits. (R. at 185 – 212). On occasion, it had been noted that he heard voices, or was anxious, sad, or fearful. (R. at 193, 195, 203, 209). Plaintiff's diagnoses over this period included bipolar disorder with psychosis, major depressive disorder with psychosis, attention deficit disorder, attention deficit hyperactivity disorder ("ADHD"), substance dependency, post-traumatic stress disorder ("PTSD"), generalized anxiety disorder, schizoaffective disorder, and alcoholism. (R. at 184 – 212). GAF scores ranged from 38 to 55. (R. at 185 – 212). Plaintiff was usually noted to be compliant with his medication regimen, and was doing well with a stable mental status. (R. at 184 – 212).

On April 25, 2007, Dr. Wayne completed a psychiatric evaluation of Plaintiff. (R. at 213 – 14). Plaintiff was noted to be in relatively good health, with a history of alcohol, cocaine, and

5

marijuana dependence. (R. at 213 – 14). Plaintiff also had a history of trouble with authority figures, and deficits in attention and concentration. (R. at 213 – 14). Plaintiff was otherwise alert, oriented, and cooperative, denied psychotic symptoms, and denied being depressed or suicidal. (R. at 213 – 14). Dr. Wayne's diagnoses were schizoaffective disorder, PTSD, and cocaine and alcohol dependency in partial recovery. (R. at 213 – 14). Plaintiff's GAF score was 40. (R. at 213 – 14).

On November 11, 2008, the program director, John Ross, at Pyramid Healthcare's ¾ house – where Plaintiff was residing – wrote a letter regarding Plaintiff's time at the facility. (R. at 215). Mr. Ross noted that Plaintiff was regularly tested for drugs, and since entering the program with Pyramid had adjusted to the program, was following the rules, and was doing very well. (R. at 215). Plaintiff was regularly receiving therapy. (R. at 215). Mr. Ross believed Plaintiff's well-being would be improved with an award of SSI benefits. (R. at 215).

### C. Administrative Hearing

At his hearing, Plaintiff described his greatest barriers to maintaining employment as disorientation, an inability to concentrate, and voices in his head. (R. at 44). Plaintiff explained that he would get half way through a book or newspaper article and forget what he had just read. (R. at 60). However, he usually was able to watch television and follow the shows. (R. at 60). Plaintiff also complained of difficulties with severe depression, severe anxiety, and suicidal thoughts for approximately four or five years. (R. at 48 – 49).

Plaintiff had been seeing a therapist at Mon Yough once a week, every week, for the past seven or eight months. (R. at 49, 57). He also attended Narcotics Anonymous ("NA") meetings every day. (R. at 50). He had been maintaining a medication regimen which he found to help relieve/ control his symptoms, though he was uncertain of the effects of a newly started

6

medication. (R. at 50, 57, 62 – 64). Plaintiff explained that he struggled with cocaine and marijuana abuse, but had been sober for approximately two years at the time of the hearing. (R. at 51 – 53). He denied alcohol abuse issues, but upon further probing by the ALJ admitted to alcohol abuse in high school/early adulthood. (R. at 51 – 52, 54).

Plaintiff explained that for approximately two years he had been participating in a live-in rehabilitation program – Pyramid. (R. at 52, 55, 57). He was being released after completion of the program the day after the hearing. (R. at 53). He was going to reside with his son. (R. at 53). The Pyramid program involved daily morning and evening meetings, and a "wrap up" meeting at 10:00 p.m. (R. at 52, 55). For the remainder of each day, Plaintiff would be required to do chores at his Pyramid residence, including cooking, cleaning, shopping, and laundry. (R. at 55 – 56). He lived with a roommate in the Pyramid residence. (R. at 56).

Plaintiff stated that he was capable of handling his responsibilities, and that he did not experience problems following his schedule. (R. at 56, 61). At times he would become frustrated, because he was not used to doing the activities required of him in the Pyramid program. (R. at 61). Plaintiff later took a more extreme tone in response to questions posed by his attorney, describing a more severe response to his frustration, wherein he often would physically ball up on his couch three to four hours a day for several days each week. (R. at 64, 67 – 68).

He claimed a lack of interest and motivation, although he did not have a problem with energy. (R. at 65). Plaintiff expressed trepidation over his departure from Pyramid for a less structured/ supportive environment. (R. at 58, 67). He described fear of authority figures and criticism, and resultant anger or tearfulness. (R. at 65 – 66). Yet, Plaintiff felt that he was ready

7

to leave Pyramid, and knew that his counselors in the Pyramid program also felt that he was ready. (R. at 58, 68).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether Plaintiff would be capable of returning to past relevant work if he had no exertional limitations, but could only perform routine, simple tasks, requiring short, simple instructions and simple work decisions, involving few workplace changes and no production rate pace, and requiring no more than occasional interaction with co-workers, supervisors, or the general public. (R. at 72). The vocational expert responded that Plaintiff would be capable of returning to his former positions as a laborer and cleaner. (R. at 72). If Plaintiff were off task twenty to twenty-five percent of a given workday, he would not be capable of maintaining a full-time position. (R. at 74). If he missed more than one day of work per month, he would also not be capable of maintaining a full-time position. (R. at 74). Tardiness and/ or leaving early would not be tolerated on a frequent basis. (R. at 75).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[4] and 1383(c)(3)[5]. Section 405(g) permits a district court to review

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

8

the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or

---

42 U.S.C. § 1383(c)(3).

9

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4). *See Barnhart v. Thomas,* 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986).

## V. DISCUSSION

The ALJ concluded that Plaintiff had medically determinable severe impairments in the way of bipolar disorder, adjustment disorder, personality disorder, cocaine/ alcohol dependence, major depressive disorder with psychotic features, ADHD, and schizoaffective disorder. (R. at 11). It was determined that Plaintiff was not disabled because he had the functional capacity to

10

perform a full range of work, but was limited to routine tasks with short, simple instructions, only simple, work-related decisions, few workplace changes, no production-rate pace, and no more than occasional interaction with the public, co-workers, or supervisors. (R. at 12). Consistent with the testimony of the vocational expert, Plaintiff was, therefore, capable of performing past relevant work. (R. at 17 – 18).

Plaintiff objects to the determination of the ALJ, arguing the disability determination was not supported by substantial evidence, because the ALJ failed to indicate what weight was given to the opinions of Dr. Wayne, the ALJ failed to discuss all of the GAF scores on record, and because the ALJ found Plaintiff's subjective complaints to be less than credible based upon misrepresentation of Plaintiff's activities of daily living and an old psychological evaluation by Dr. Petras at Mayview. (ECF No. 9 at 14 – 20). He concludes by claiming that as a result of the above errors, the ALJ's hypothetical to the vocational expert and RFC assessment were not a true reflection of Plaintiff's functional limitations. (ECF No. 9 at 14 – 20). Plaintiff's arguments do not merit the relief requested, however.

With respect to Plaintiff's contention that the ALJ did not specifically indicate what weight she gave Dr. Wayne's opinions of Plaintiff's condition, thereby requiring remand, this court finds the argument to be unavailing. The ALJ clearly discussed Dr. Wayne's psychiatric evaluation of Plaintiff, and succinctly – yet accurately – summarized Dr. Wayne's longitudinal history of medication checks with Plaintiff. (R. at 15). In light of the sparse findings included within the notes of each one of these medication checks – and the complete lack of functional limitations findings in any of Dr. Wayne's notes – this court is at a loss as to what more the ALJ could have discussed. Plaintiff further fails to indicate what evidence within Dr. Wayne's

11

medical notes contradicts the ALJ's ultimate RFC assessment. Remand is not, therefore, justified.

Similarly, Plaintiff's argument that the ALJ improperly failed to explicitly discuss GAF scores of 38 - 55, fails. The Court of Appeals for the Third Circuit has held that a "GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." *Gilroy v. Astrue,* 351 Fed. Appx. 714, 715 – 16 (3d Cir. 2009) (citing 66 Fed. Reg. 50764-5 (2000)). Lower courts in this circuit have further recognized that while GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability. *Coy v. Astrue,* 2009 WL 2043491, *14 (W.D. Pa. July 8, 2009) (citing *Chanbunmy v. Astrue,* 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008)). Further, where a treating source has failed to provide specific limitations findings to explain a given GAF score, or to tie the GAF score into some explanation of a claimant's ability to work, a court cannot be expected to provide a specific assessment of the GAF score. *Gilroy,* 351 Fed. Appx. at 716. *Cf. Pulos v. Astrue,* 2010 WL 2367504, *12 n 8 (W.D. Pa. June 9, 2010) (where the ALJ was directed to consider a GAF score on remand, because – unlike the *Gilroy* case – the party assessing the GAF score made statements regarding specific limitations that explained the basis for the score).

Plaintiff is correct that the ALJ did not mention any GAF scores explicitly in her determination. Yet, this is not a case where the ALJ merely cherry picked certain GAF scores to bolster her conclusions, and similarly to the case in *Gilroy,* no specific limitations findings or explanations accompanied Plaintiff's GAF scores. *See Gilroy,* 351 Fed. Appx. at 716. An ALJ is entitled to overlook evidence that is not probative. *Johnson v. Comm'r of Soc. Sec.,* 529 F.3d

12

198, 203 – 04 (3d Cir. 2008). Given the ALJ's otherwise thorough discussion of Plaintiff's medical history and the notes wherein the GAF scores were provided, the court finds that the ALJ's discussion does not constitute error requiring remand. *See Coy*, 2009 WL 2043491, *14 ("The failure to mention the scores specifically does not constitute reversible error. The Court declines plaintiff's invitation to remand solely so the ALJ can insert the GAF scores into his decision.").

Plaintiff's final argument that the ALJ's credibility determination was unsupported fails for two reasons. First, the ALJ's consideration of the Mayview records from June – September of 2005 was not improper. As was pointed out by Defendant, 20 C.F.R. § 416.912 contradicts Plaintiff's assertion of error, and states in relevant part:

> (d) Our responsibility. Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application. We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.

20 C.F.R. § 416.912(d). The regulation provides that evidence preceding the date of filing by at least twelve months be compiled. *Id.* Further, there is nothing in the regulations which states that the ALJ cannot go farther, and Plaintiff fails to illustrate how consideration of evidence which predated his alleged onset date of disability by less than a year was irrelevant to his disability determination, or was prejudicial. *Id.* Despite Plaintiff's claims to the contrary, Dr. Petras did not assume that Plaintiff was guilty of the charges for which he was committed to Mayview, stating only that Plaintiff did not accept the implications of the charges against him. (R. at 142). Moreover, Plaintiff was not found to lack credibility because of presumed guilt, but because of the constant inconsistencies in the statements that he made. (R. at 14). This was part

of a larger pattern of inconsistent behavior at Mayview. (R. at 14 – 15). As such, consideration of the records from Mayview is not shown to be inappropriate.

Second, the ALJ properly utilized Plaintiff's statements regarding his daily activities at Pyramid to judge the credibility of his subjective claims. 20 C.F.R. § 416.929; *Wilson v. Astrue*, 331 Fed. Appx. 917, 920 (3d Cir. 2009) ("[T]he ALJ properly evaluated . . . impairments and subjective complaints in light of the objective medical evidence and [claimant's] stated activities of daily living."). *See also Thompson v. Halter*, 45 Fed. Appx. 146, 149 (3d Cir. 2002) ("Here, the objective medical evidence, the evidence that [claimant] only stopped working because her company lost its cleaning contract with *TV Guide*, the evidence that [claimant] worked as a cleaner after her layoff, and the evidence of her activities of daily living constituted substantial evidence that [claimant] could do her past relevant work...").

Plaintiff adhered to a highly structured daily schedule while at Pyramid, without difficulty, including the performance of numerous daily tasks and chores that could hardly be characterized as sporadic or transitory. There was no evidence of significant limitation in these daily activities. Plaintiff stated that he was ready to leave the Pyramid program, despite some anxiety, and Mr. Ross indicated that Plaintiff had successfully completed the Pyramid residential program. (R. at 13 – 17). Plaintiff's statements about his inability to complete some activities conflicted with other statements by Plaintiff and Mr. Ross indicating otherwise. (R. at 13 – 17). Plaintiff, therefore, fails to show how the ALJ misconstrued Plaintiff's activities of daily living.

Lastly, Plaintiff argues that the lack of substantial evidence supporting the ALJ's conclusions rendered her hypothetical question and RFC assessment inadequate. In light of the above discussion, it is clear that the ALJ provided a thorough analysis of the medical evidence underlying Plaintiff's claim for disability benefits. Having provided significant record evidence

14

to support his findings, this court can conclude nothing other than that all the credibly establishing medical impairments suffered by Plaintiff were properly incorporated into the hypothetical, and were accommodated fully in the ALJ's RFC assessment.

## VI. CONCLUSION

Based upon the foregoing, substantial evidence supported the determination by the ALJ that Plaintiff was capable of returning to past relevant work, despite his severe impairments. Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted; and, the decision of the ALJ is affirmed.

Gary L. Lancaster
Chief United States District Judge

cc/ecf: Karl E. Osterhout, Esq.
521 Cedar Way
Suite 200
Oakmont, PA 15139
(412) 794-8003

Lee Karl, Esq.
United States Attorney's Office
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
(412) 644-3500